Good morning, Your Honor. Deventerio Orr for the petitioner, Maikal Halim. May it please the Court. Rory Wallace was on the briefs. I'd like to reserve three minutes for my rebuttal. All right. If you can watch, I'll also try to help you. Thank you. Mr. Halim requests that this Court remand to the board with instructions to remand to the immigration judge. I'd like to explore three reasons this morning why this is the correct result here. I'll summarize those reasons and then explain each. Mr. Halim put forth sufficient evidence of changed circumstances to require a remand to permit the immigration judge to apply for the first time in Mr. Halim's case. This Court's disfavored group analysis from Sahl, Wakari, and Tampuvalon. Second, the board abused its discretion by both misstating the record evidence and ignoring controlling law in concluding that Mr. Halim failed to make out a prima facie case for asylum. Can't the board look at the merits in connection with the motion to reopen in order to make a preliminary determination as to whether or not it is a colorable claim for relief? Well, the board can certainly look at the merits, but the problem in this case, as I'll explain, is that the board misstated the law and ignored the record evidence showing that there were changed circumstances in the case. Well, that wasn't the question that I asked. You're answering a different question. The question really is one of authority. As I understand your argument, your argument is that the board doesn't have the authority to look at the evidence. All it can do is remand it to the immigration judge so that he can conduct an evidentiary hearing and assess the weight of the evidence that the petitioner has. Okay, I understand the question. Now, I think the issue here is that the board certainly can look at the legal issue of changed circumstances and determine whether there is sufficient evidence of changed circumstances. Will you turn off the telephone, please? Thank you. Whether there's sufficient evidence of changed circumstances to warrant a remand. So our contention is that the board erred in concluding that there was insufficient evidence of changed circumstances. Does that answer your question? Looks like maybe not. I mean, the problem I'm having with the argument is that the board has to make a preliminary look at the evidence that is offered to justify the reopening. And the board looked at that evidence and said, we don't see any significant evidence of change here. Did they not? Well, that was the board's conclusion, and we think that that conclusion was wrong. I understand that. But essentially, as I read the board's opinion, what they're saying is you haven't shown enough evidence that there has been a change in order to warrant reopening. So, the question is, can we do that? Or is it your position that all you have to do is ask for permission to reopen claiming changed circumstances, and the board must then remand it to the IJ as the initial fact finder? Well, I mean, certainly this Court's decisions have made clear that the board can make that initial determination. So, we're not claiming that every time you claim changed circumstances, you automatically get a remand. So, then we would review for abuse of discretion the board's decision not to reopen? Absolutely. I mean, that's clear. It's abuse of discretion review. But, you know, the problem here is that, you know, the board's analysis fails to take cognizance of the fact that, in fact, there were changed circumstances. What are the changed circumstances that you think the board did not recognize? Certainly. So, we believe that the board abused its discretion in rejecting Halim's evidence of changed circumstances because the record evidence is more than sufficient to establish that there has been a change. I'll just point to a couple of those sites. I mean, first of all, the Sitara report from 2009 establishes that there's an increase of mob violence targeting Christians, and that there were attacks on Christian leaders. That's at AR 130 and 152. And the mob violence is too frequent, and punishment for perpetrators is too infrequent to act as a deterrent. Particularly as relevant to the government's ability to control this violence, the Sitara report at 135 notes that of the 139 violations, 101 of them have active involvement from state agencies, and that in many cases the authorities turned a blind eye and decided with the offending majority. The BBC reported at AR 138 there were more than 100 churches that faced attacks between 2008 and 2010. And I think particularly relevant to Mr. Halim's case at AR 160, there was a report of a clothes trader who, like Mr. Halim, converted from Islam to Christianity, and he was arrested for blasphemy for sharing his Christian faith and later beaten by a mob. And the police in that case said that if he had arrived 10 minutes later to the hospital, he would have been killed. So I think there's evidence that four Christians were murdered at AR 161, and particularly the DOS religious freedom report from 2009 notes at 162 that discrimination was tolerated and abuse of religious groups by private actors goes unnoticed. You know, as families continued to live there and practice Christianity without any apparent difficulty, is that something the BIA could take into account? Well, you know, this court is limited to the board's actual decision. The board's decision in the reopening, I don't believe references anything about his family's, you know, status. Well, what do we do with Well, Halim number one was a direct appeal, of course. And, you know, on a motion to reopen, one thing that I think is important to realize is that the factual assertions in a motion to reopen are deemed true unless the BIA makes a finding that they're inherently unbelievable. And the BIA has the power to make that finding, and they have not done so here. Well, but is the evidence that you provide, the showing that you've provided on reopening, does it have to be something more than simply a greater generalized risk by, at most, a greater generalized risk for people in this situation? Well, I mean, I think that one other thing that comes into play here is that, you know, does it have to be more than that? I think if it's an increase, an increase, a substantial increase in the risk to a disfavored group, I think that should be sufficient. I mean, and we have the documents in the record establish an increase. That's not what our case law says, does it? It says it has to be a combination, both that a showing is disfavored, which I don't think the government is disputing here. That was before the immigration judge the first time around. The question, though, is that he must then couple it with a showing of individualized risk to him. And that's what the board focused on in its order of February 14, 2011. That's correct. But, I mean, we believe the board erred in that finding for two reasons. I mean, first... Erred as a matter of fact? Or erred as a matter of law? Well, we think it abused its discretion in finding that in ignoring the record evidence, first, that Mr. Helene is not merely active in his church. And that's the word that the board used in its decision, saying he's active in his church. But that's not what the record says. The record says AR-58, he, quote, served in the church with ministry to both adults and children. And at AR-53, he says, I cannot and will not hide my faith. Okay? This is somebody who practiced his religion in secret when he was in Indonesia. So are you saying that the description of being active in his church and not hiding his faith is somehow inconsistent? Would the board need to use that magic language of his affidavit? I'm not using... I'm not saying a magic language argument here, Your Honor. I'm saying that this Court's decisions in Wackery and Kampuvalon particularly, and actually this Court's decision in Helene I, all state that... Helene I specifically notes Wackery and says, you know, there's no signing of individualized risks like there was in Wackery, where he was a minister, you know, and had this extra risk. And here, he's coming forward and saying, you know, since I came here in 2003, I now... Like, I'm an active... I'm active in my church, and coupled with the fact that there's an increase in attacks on Christians in Indonesia. Would you like to reserve... I would like to reserve the balance if there's no further questions. Thank you. Good morning, Your Honors. May it please the Court, I'm Lindsay Corliss. I'm here to represent the respondent in this case. Now, the board did not abuse its broad discretion when it... denied Helene's untimely motion to reopen. Helene moved to reopen his case on two bases, this Court's decision in Kampuvalon v. Holder, and also on a purported change in country conditions related to Christians in Indonesia. And I'll discuss each bases in turn. First, the board properly found that this Court's decision in Kampuvalon v. Holder did not warrant reopening of Helene's case. In 2009, this Court determined that Helene's first petition for review did not warrant remand or reopening after finding that... after the board found that he was not entitled to relief based on his claim of being a Christian Chinese man in Indonesia. This Court already analyzed Helene's claim when it found that Helene's claim was analogous to the petitioner's claim in Wakari, also submitted by a Chinese Christian Indonesian. And this claim was also done under a disfavored... under a disfavored group analysis. But this Court already found that Helene's failure to make even, as they stated, a minimal showing of individual targeting negated any need to remand to the agency. Now here, the Court is saying that Kampuvalon... the board is saying that Kampuvalon did not change the necessity of an applicant to show that there is an individualized risk of future persecution. And since Helene did not show that he will... faces an individualized risk of persecution, Kampuvalon did not affect Helene's case. Although a petitioner states that he used to practice Christianity in secret and now is playing an active role in his... in his religion, if you look back to Helene 1, you'll see that that's not the case. In Helene 1, the petitioner stated in his declaration that he had attended a being a Christian in public. The fact that he was a Chinese man indicated to many Muslims in the community that he was a Christian, and often he was made fun of. He was called the equivalent of a pork eater, which he stated was a slur against Christians in Indonesia. So this is a man who was not practicing Christianity. Additionally, his church is an open church in Indonesia. They do recognize... Can you say that again? This is not a man who is not practicing... Who had not practiced openly Christianity while he was living in Indonesia. So you're saying that he was openly practicing there and he's openly practicing here, so there's no shame. Yes. I got confused with the negative. Oh, I'm sorry. I'm sorry. I'll say it again, that he was practicing openly Christianity during his first claim, and he's still actively involved in his church in this claim. There is no change there that would give rise to an individualized risk that this court already determined was not great enough in order to succeed in his claim. I also want to note that when this court made that finding, the way they stated it was they said even if Halim is found credible, which he was not by the immigration judge in the decision upheld by the board, they would have found there was no individualized risk, or there wasn't even a minimal individualized risk shown. Okay. Second, the board properly found that country conditions in Indonesia had not changed to warrant reopening. In order for country conditions to change in order to warrant reopening, the country conditions need to be materially different from the way that country conditions were when he submitted his first claim. And it's petitioner's burden to establish a baseline of what country conditions looked like in 2003. He didn't actually submit information on 2003. However, we do have information in the record regarding country conditions in 2003 based on his first claim. You can see that he had submitted the United States State Department report on country conditions in Indonesia from 2002 with his first claim. It's located on 274 of the record. And you see on page 284 of the record in that State Department report under the heading abuses of religious freedom. That goes through all of the abuses that were going on in 2002. Just notably, the State Department found that the government has sometimes tolerated abuses of religious freedom, saying it did not have the capacity to deal with the, as they phrased it, emotions of private actors who are discriminating against or harming Christians. If you compare that to the reports in 2009, where the government was taking active role in prosecuting people who abused the freedoms of Christians in Indonesia, you see that that's actually an improvement. On page 284, some other examples of violence related to religious groups in Indonesia, you see that in the Moluccos, 100 persons were killed and between 300,000 and 425,000 Christians were displaced because of conflict, violent conflict between Muslim extremist groups and Christians. You also see that on Christmas Eve of 2000, and this is a specific incident that a petitioner actually raised in his first claim. He pointed out that on that date, December 24, 2000, 34 churches were either bombed or there were attempted bombs, and there were 18 Christians killed in those blasts. He already brought that to the attention of the agency and this court in his first claim. These are all things that are stated in the record about 2003. He hasn't shown any... Is your argument that he's barred by law of the case from re-raising these arguments? Yes. Well, he's barred by case for re-raising arguments. Also, the board didn't abuse its discretion when finding that the country conditions had not changed materially since 2003. He would have had to establish some baseline of what was going on in 2003 in order to say, look, things are now different in 2009 when I'm submitting my second claim. Are you saying, though, that he can use the reports he submitted in Halim 1 to establish some baseline, correct? Right, and the court can analyze this to see whether or not the board abused its discretion when it found that country conditions hadn't changed materially. Unfortunately, if things were bad then and they're bad now and it's not different, then country So this court would also be bound by the law of the case if the conditions were the same between the two. I wanted to also go back because this was argued in briefs regarding Mr. Halim's son who apparently suffers developmental delays and while the board stated, of course, that's sympathetic, there wasn't a basis that was actually argued in Halim's motion to reopen. He didn't exhaust any argument related to why that caused him to have a claim for asylum. When he submitted his motion to reopen with the board and he submitted that material, he didn't connect, he didn't submit any material saying that persons with disabilities are abused or are persecuted in Indonesia. He didn't submit any evidence saying that the problems of his son would be imputed upon himself. None of these things were argued, they were just submitted to the board. So the board did not abuse its discretion when it found that there was no basis on which it could give Mr. Halim relief based on his claims that his son suffers from developmental delays. Now unless the court has more questions, then I would rest on our briefs and statements made here. Thank you. I'd just like to make a couple points in my brief time. First of all, the record reflects at AR 51 that Mr. Halim practiced his religion in secret in Indonesia. As I stated earlier, those facts in the motion to reopen are deemed true absent of finding by the board that they're inherently unbelievable. Secondly, the government throws around this credibility finding a lot in the briefs and again here at oral argument. The credibility finding was quite narrow and it was limited to statements by Mr. Halim's mother and Mr. Halim regarding that the government of Indonesia does not protect ethnically Chinese Indonesians. And the IJ found that this testimony was exaggerated, but the IJ's finding has been severely underlined by this court's subsequent decisions in Sal, Wakhri, and Tanpubilan, all of which stand for the general proposition that in fact those of Chinese ethnicity are disfavored in Indonesia and this is exactly the point of the original testimony. So I think the adverse credibility finding is really quite overstated here. Finally, I wanted to make sure I make my final point from my original argument, which is that the board did apply the wrong legal standard in this case using the clear probability of harm, which is a withholding standard. We don't have any basis to conclude that the board, if they had properly analyzed the case under the correct legal standard, would have reached the same conclusion. So unless the court has any further questions, we'd ask that the court grant the petition, remand to the immigration court, or direct the board to remand to the immigration court. Thank you. Thank you. Thank both counsel for your argument this
judges: Schroeder, McKeown, Tallman